# SUPREME COURT

OF THE.

# STATE OF COLORADO.

## April Term, 1905.

[No. 4613.]

HEAD CAMP PACIFIC JURISDICTION WOODMEN OF THE
WORLD v. WOODS.

1. Mutual Benefit Insurance Associations—Woodmen of the
   World—Head Camp Sessions—Place of Meeting.
   Sessions of the head camp of Pacific Jurisdiction Woodmen
of the World may legally be held in any state within its juris-
diction.

2. Mutual Benefit Insurance—Certificate—Laws of Association.
   Where a mutual benefit insurance certificate provided that
the right to participate in the benefits should be forfeited by
a failure of the beneficiary to comply with the laws of the
order then in existence and such as might be adopted, changes
in the constitution of the order providing for an additional
assessment for an equalization fund, and providing for the
payment of the benefit assessment monthly in advance, were
authorized and were binding on the beneficiary.

### 3. Same—Extra Hazardous Risks.

Where the by-laws of a mutual benefit association provided that if an assured should engage in any of certain named hazardous vocations he should in addition to the regular assessment pay an additional specified assessment while so engaged and in default should forfeit his right to the benefit in case of death resulting from such extra hazardous risk, and an insured did engage in such extra hazardous vocation without the knowledge of the association or of his beneficiary, and the beneficiary continued to pay the regular assessments but paid no additional assessment on account of such extra hazardous risk, the beneficiary was not entitled to the benefit in case of death resulting from such extra hazardous vocation.

### 4. Same—Estoppel.

Where a mutual benefit insurance order after issuing an. insurance certificate, provided for an equalization fund and for advance monthly assessments, and the beneficiary in the certificate paid the additional assessments for the equalization fund and also the advance monthly assessments without protest, after the death of assured the beneficiary cannot claim that the additional assessments were illegally exacted or improperly applied and that she is entitled to have them applied in payment of extra hazardous risk assessments which were in default at the time of the death of assured. Nor did the retention of the assessment paid for the month succeeding the death of assured estop the association from disputing its liability for a failure to pay extra hazardous risk assessments.

*Appeal from the District Court of Gunnison County: Hon. Theron Stevens, Judge.*

This case was tried to the court upon an agreed statement of facts from which it appears, *inter alia,* that appellant existed as a fraternal organization prior to its incorporation, under its present name.

In August, 1890, it held what is termed a head camp session in Denver, Colorado, at which there were adopted certain by-laws and regulations of the organization known as "fundamental laws" for the government of head and local camps and camp by-laws. It was organized on the "lodge plan." Each benefit member in addition to initiation or introduc-

tion dues was required to pay at stated periods camp
dues to the local camp of which he was a member,
and through the local camp officers to pay assess-
ments for a benefit fund to meet death claims of the
head camp, as well as what was termed a *per capita*
tax to supply the head camp with funds for necessary
organizing and operating expenses.

Among other things in said fundamental laws
adopted at said head camp session in August, 1890,
were the following, viz:

Section A of division A was as follows: "This
body shall be known as the Head Camp, Pacific Juris-
diction, 'Woodmen of the World,' embracing the
states of Colorado, Wyoming, Montana, Oregon,
Washington, Nevada, California, and the territories
of Idaho and Utah. The principal office shall be at
the office of the head clerk, which office shall be at
the city of Denver, Colorado."

Section C of division A was as follows: "The
head camp shall have supervision over all the local
camps within its jurisdiction, shall prescribe laws
for their government, not in conflict with those of the
sovereign camp; shall provide rituals and supplies
for their use."

Section A of division I provided as follows:
"Persons to become members must be white males at
least twenty-one and not over fifty years of age, of
good, sound bodily health and mind, of exemplary
habits, good moral character, and engaged in an hon-
orable and lawful business or vocation.  Persons
engaged in the following kind of business or employ-
ments shall not be admitted as members of this order:
Railway freight brakemen, railway engineers, freight
conductors, firemen and switchmen, miners, em-
ployees. in gun powder factories, wholesalers and
manufacturers of liquors, saloon keepers, saloon bar-
tenders, balloonists, sailors on lakes or seas, plow

grinders and brass workers, and professional firemen, electric engineers and linemen, or parties engaged in vocations which are really apprenticeships to any of the vocations herein named, and any one who, after becoming adopted and receiving this certificate, shall engage in any of the prohibited vocations, shall forfeit all insurance and benefits thereunder.''

Said fundamental laws provided for biennial head camp sessions and that each head camp session should be held at such time and place as the preceding session should determine. Said head camp session held in August, 1890, provided for the second head camp session to be held at Pueblo, Colorado, in August, 1892. Both prior and subsequent to its incorporation defendant as a fraternal body proceeded to organize local camps under its jurisdiction in the nine states and territories above named, and for many years has had camps in each of said nine states and territories.

The following benefit certificate was issued to John T. Woods, husband of plaintiff, of date of June 28, 1890:

"No. 2061                                              Amount $3000.
"Age 30                                                Rate, $1.30.
                    "Benefit Certificate
                        "Head Camp
                "Woodmen of the World
                    "Pacific Jurisdiction.

"This certificate, issued by the head consul and head clerk of the Pacific Jurisdiction, Woodmen of the World, by its authority,

"Witnesseth: That Neighbor John T. Woods, a member of Gunnison Camp, No. 39, located at Gunnison, Colo., is, while in good standing in this fraternity, entitled to participate in its benefit fund to an amount not to exceed three thousand dollars, which shall be paid at his death to his wife, Huldah

E. Woods, by its head camp, subject to all the conditions named in this certificate, and named in its fundamental laws, and liable to forfeiture if said neighbor shall not comply with said conditions, laws and such by-laws and rules as are or may be adopted by the head camp or the local camp of which he is a member.

"In witness whereof we have hereunto affixed our official signatures and impressed the seal of the head camp. Done at Denver, state of Colorado, this 28th day of June, A. D. 1890.

(seal)      "F. A. Falkenburg, Head Consul.

"E. W. Douglas, Head Clerk.

"Registered and delivered this 9th day of April, A. D. 1892.

"Henry F. Lake, Clerk.

"A. B. Mathews, Consul.

"Gunnison Camp, No. 39."

On January 20, 1891, the organization was regularly incorporated pursuant to  sections 636 to 640, Mills' Ann. Stats.   After stating its purpose to organize as a Colorado corporation (not for pecuniary profit) and its corporate name, the second subdivision of its articles reads as follows:  "The objects for which said association is formed are to promote social and fraternal intercourse among ourselves and our associates; to secure pecuniary aid to the widows, orphans, heirs and devisees of deceased members of said association; to give pecuniary aid and employment to members of said association who may be in need or want; to aid one another in distress; to hold and convey such real estate and other property as may be necessary to conduct the affairs of the association; to authorize and establish laws, secret work and rituals for subordinate camps; to prescribe laws and rules to govern the same; to organize subordinate camps in the states of Colorado, Wyoming, Montana,

Washington, Oregon, Idaho, Nevada, and California, and the territory of Utah.''

The third subdivision in said articles is in words as follows: ''The principal office of said association shall be located in the city of Denver, state of Colorado; but meetings of said association may be held at any time within the states of Colorado, Wyoming, Montana, Washington, Oregon, Idaho, Nevada and California, or the territory of Utah.''

The fifth subdivision is in words as follows: ''The said association shall have power to make and adopt a constitution, by-laws, rules and regulations for the admission, suspension or expulsion of members and for the government of this association and all subordinate camps, for the collection of assessments, fees and dues, and shall prescribe the number and duties of all officers and members; shall prescribe the manner of safely keeping and paying out all moneys, and may alter, modify or change the constitution, by-laws, rules and regulations at will.''

The second head camp session of defendant and the first head camp session after its incorporation was held at Pueblo, Colorado, in August, 1892, and was a representative body consisting of the officers of the head camp and delegates from each camp under its jurisdiction. Said session was regularly convened and organized, and on August 16, 1892, by a more than two-thirds vote of all its members regularly adopted what was designated as its ''constitution,'' as well as forms for camp by-laws.

Article 26 of said constitution contained three sections, as follows:

''Sec. 1. This constitution may be amended by a two-thirds vote of the head camp, or by a two-thirds vote of the executive council, when ratified by two-thirds of the camps in the jurisdiction.

''Sec. 2. All fundamental laws heretofore

adopted are superseded and abrogated by this constitution.

"Sec. 3.  This constitution shall take effect and be in force immediately upon its adoption."

Said constitution so adopted in August, 1892, at Pueblo, Colorado, contained the same general plan which had previously been in vogue, with some improvements in detail.

Article 24 of said constitution took the place of what has been set forth as section A of division I of the fundamental laws adopted at Denver in August, 1890.  Said article contained the prohibition against railway freight brakemen and persons engaged in other named hazardous vocations being eligible to initiation to benefit membership, but contained the following provision at its close: "Any one who, after becoming introduced and receiving this certificate, shall engage in any of the prohibited vocations, shall, while so employed or engaged, be required to pay fifteen cents per thousand dollars in addition to the regular beneficiary rate agreed upon and specified in the certificate, and a failure to do so shall work a forfeiture of membership and all benefits thereunder."

Section 4 of article 23 of said constitution adopted at Pueblo, Colorado, in August, 1892, is in words and figures as follows:  "Every beneficiary certificate hereafter issued and all beneficiary certificates heretofore issued, shall be considered as containing the following clause: 'This certificate shall be incontestable after one year from date thereof, provided the neighbor to whom it is issued has complied with all the requirements thereon.' "

The uniform construction of said section, always followed by defendant and its officers, has been to the effect that after one year from date of a benefit certificate defendant would not be at liberty to con-

test a certificate after the death of a member in good standing on account of any claim of misrepresentation in the application for membership, but that the defendant was at liberty to contest payment of benefits under a certificate in event the member on account of whose death claim was made failed to keep himself in good standing, or failed to comply with conditions provided in the constitution and by-laws of defendant, and particularly conditions pertaining to entering into named hazardous vocations. ·

The constitution also provided for biennial head camp sessions, each of which was to be held at such place within the Pacific Jurisdiction as the previous head camp session should determine.

The head camp session held at Pueblo, Colorado, in August, 1892, provided that the next head camp session should be held at Portland, Oregon, in August, 1894. A head camp session of defendant was convened at Portland, Oregon, in August, 1894, and provided that the next head camp session should be held at Helena, Montana, in August, 1896. A head camp session of defendant was held at Helena, Montana, in August, 1896, which provided that the next head camp session of defendant should be held in San Francisco, California, in August, 1898. A head camp session of defendant was held in San Francisco, California, in August, 1898, which provided that the next head camp session should be held at Salt Lake City, Utah, in August, 1900. A head camp session of defendant was held at Salt Lake City, Utah, in August, 1900, which provided that its next head camp session should be held at Cripple Creek, Colorado, in August, 1902.

All said head camp sessions have been representative bodies, composed of delegates elected from the body of the membership of defendant in accordance with the constitution of head camp by-laws of

defendant in force at the time of their respective meetings.

Plaintiff contends that there is no authority in law for holding head camp sessions or legislative bodies of defendant outside the state of Colorado. This position is controverted by defendant.

At the head camp session of defendant held and organized at Portland, Oregon, in August, 1894, a new constitution was adopted, following in its general features the previous constitution.

In the constitution of defendant adopted at Portland, Oregon, in August, 1894, by a two-thirds vote of said body, section 1 of article 24 continued the provision rendering ineligible to initiation persons engaged in certain enumerated hazardous vocations, including that of railway freight brakeman, but increased the list of vocations deemed hazardous and increased the rate to be paid when engaged in such hazardous vocation, including that of railway freight brakeman, from 15 cents per $1,000 of benefit to 20 cents, but otherwise made no change in the provisions of the Pueblo constitution. Said Portland constitution contained similar provisions for meetings of head camp sessions as in previous constitutions.

At the head camp session held and organized at Helena, Montana, in August, 1896, a new constitution was adopted for defendant, which purported to take the place of all preceding fundamental laws or head camp constitutions. The constitution adopted by a two-thirds vote of the head camp session at Helena, Montana, has since that time never been repealed as a whole though amendments have been made to certain of the sections at subsequent head camp sessions. What is now known as the "revised constitution" of defendant is the result of legislation in conformity with the rules and practice of the several head camp sessions from 1896 to

1900, both inclusive.   In the revision authorized by the head camp session held in Salt Lake City, Utah, in August, 1900, many of the sections have been renumbered so as to make consecutive numbering.

With reference to the payment of benefits arising from the death of members engaged in a prohibited or hazardous vocation, the legislation of defendant subsequent to the session held at Portland, Oregon, in August, 1894, is as follows:

At the head camp session held at Helena, Montana, in August, 1896, section 103 of the constitution by its adoption continued in force the rule that a person to be eligible to benefit membership must not be engaged in any of several hazardous vocations, including that of railway freight brakeman, and in section 106 of said constitution enacted as follows: "Any benefit member properly introduced and receiving his benefit certificate who, while in good standing, shall engage in any of the prohibited vocations mentioned in section 103, other than that of saloon keeper, saloon bartender or manufacturer of intoxicating liquors, shall, notwithstanding, be permitted to retain his benefit membership while so engaged, on condition that while so employed and engaged he shall pay at rate of 20 cents per $1,000 of benefit per each single assessment in addition to his regular assessment rate, and not otherwise.   A failure to pay said extra rate when so employed or engaged shall deprive his beneficiaries of any right to receive benefit as the result of his death from accident or disease occasioned by or resulting from said hazardous occupation.   No suspended member can be reinstated when engaged in any of said prohibited occupations."

Said section 106 was amended by the head camp session held in San Francisco, California, in August, 1898, by raising the rate per $1,000 of benefit for

each single assessment from 20 cents to 50 cents. No amendment of said section in any way material to this case was subsequently made.

Other amendments to the head camp by-laws or constitution of defendant adopted since August, 1894, with reference to the duties of members to keep in good standing are summarized as follows:

It has ever been the duty of all benefit members, both prior and subsequent to the adoption of the Pueblo constitution, to pay camp dues to meet the current expenses of the local camp. Now, and for seven years last past, the *per capita* tax paid to the head camp is and has been paid out of the local camp treasury and out of the camp dues paid by the members.

Prior to 1896 assessments were called to pay death claims after the death proofs were approved by the proper officers. This caused some delay in the payment after approval. The language of the consti- tution adopted at Portland, Oregon, in 1894, in that behalf and with reference to the powers of certain head officers was: "They shall monthly call and cause to be published in the official organ notice of assessments sufficient to produce, when collected, a sum adequate to pay all death claims then approved, including monuments. When one assessment is sufficient, the published call in 'The Pacific Woodman' shall be the only notice to be given. When no assessment or a multiple assessment is called in any one month, special notice shall also be mailed by clerk of each camp to each member thereof."

At the head camp session held in Helena, Montana, in August, 1896, with reference to the same head officers' authority to call assessments, it was enacted in section 101 of the constitution then adopted, which superseded all previous fundamental laws and constitutions, as follows: "The head offi-

cers above mentioned authorized to sign assessment
calls can call a double or multiple assessment for
any month, when they unanimously find it expedient
so to do, to promptly meet death claims. When said
head officers find no assessment is necessary for any
particular month, they shall certify to that fact and
cause the said certificate to be published in 'The
Pacific Woodman.' In making assessments said head
officers shall, so far as practicable, be governed by the
following rule, viz.: They shall cause the benefit
fund to be so maintained and replenished that each
death claim may be paid within twenty days after the
death proofs are approved, and that each monument
for which the head camp is liabble may be paid for
within twenty days after the head clerk receives
proper evidence of its erection.''

Under said action the practice prevailed that
said head officers issued a call for one assessment
per month, since the time never occurred when in
their judgment they found no assessment necessary
for any particular month.

At the head camp session held at Salt Lake
City, Utah, in August, 1900, said section 101 (which
now appears as section 99 of the revised constitution)
was amended by striking out the sentence ''When
said head officers find no assessment is necessary for
any particular month, they shall certify to that fact
and cause the said certificate to be published in 'The
Pacific Woodman,' '' and also by inserting at the end
of said section the words, ''In any event at least one
assessment shall be called for each and every calen-
dar month.''

Prior to the enactment of the constitution of 1896
by the head camp session held at Helena, Montana,
there had been occasionally a month in which no
assessment was called, and there had occasionally
been a month when a double assessment was called

to meet the obligation arising from death claims. The legislative body of defendant deemed it wise to have one assessment every month in order to avoid such irregularity and if possible to avoid or postpone the necessity of calling a double assessment in any single month.

At the head camp session of defendant held at San Francisco, California, in 1898, provision was made for the creation of what was termed an "equalization fund." By that body there was also an amendment to that section of the constitution then numbered 101a.

There were provisions in the constitution at that time for amendments to the constitution being made by a body known as the "executive council," consisting of all the head officers of defendant, when ratified by two-thirds of all the camps. At a regular meeting of the executive council of defendant held in Denver, Colorado, in the month of August, 1899, by a two-thirds vote of all the members of that body, promptly ratified by a two-thirds vote of all the camps then in the jurisdiction of defendant, said section 101a was amended so as to read as follows:

"Sec. 101a. 1. Beginning with January, 1899, each benefit member theretofore introduced, and each benefit member introduced subsequent to January 1, 1899, beginning with the month when the next equalization fund payment is due, and in order to maintain himself in good standing, shall, for twenty consecutive years, but no longer, pay to his camp clerk for transmission to the head banker, in addition to the payments otherwise required, the following sums in advance during the months of January, May and September in each year, according to the following schedule based upon the rates of assessments paid by the members as follows:" (Here fol-

lows schedule showing additional rates that members are required to pay.)

"In case any benefit member during such twenty years shall cause the amount of protection by him carried to be increased, his equalization fund contribution shall be accordingly augmented. In such case the payment of the difference between his old and new rate for such purpose shall continue until the termination of twenty years from the time of the receipt of his new benefit certificate.

"2. Camp clerks and bankers, the head banker, head auditor, and board of head managers shall account for the collections above provided for, as a separate head camp fund, to be known as 'equalization fund.'

"3. The head camp equalization fund shall be constituted and augmented from the following sources: (a) Direct contributions from benefit members above provided for. (b) Interest of securities in which said fund shall be invested. (c) Such surplus in the general fund as the board of head managers may in their discretion from time to time transfer to equalization fund. (d) The sum of one dollar to be collected from each new benefit member on receipt of his certificate, and transmitted by the camp clerk to the head banker. (e) The first assessment of all new members coming into the order, said assessment being the assessment for the month next succeeding the one in which such member may be introduced. (f) All surplus moneys in the benefit fund not required to meet the prompt payment of current death claims and monument bills, that shall accumulate in such fund from the proceeds: provided, that in no case shall any surplus fund be so transferred into the equalization fund if the assessments for any given fiscal year exceed twelve in number. (g) The board of head managers shall be the cus-

todians of all bonds or securities in which the equalization fund may be hereafter invested, with authority to use or employ such safe deposit vaults as may in their judgment securely preserve the said bonds or securities.

"Said equalization fund shall be invested under the direction and the supervision of the board of head managers, only in United States government bonds, bonds of states of the United States and municipal bonds of cities having a population of 50,000 or more. Such securities shall be taken in the name of the Head Camp Pacific Jurisdiction Woodmen of the World. No such securities shall ever be transferred or sold without special order for such sale made by the entire board of head managers, at a meeting thereof, which order must be approved by the head consul, head clerk, head banker and head auditor.

"5. No warrants shall be drawn on, or expenditure authorized from, the equalization fund of the head camp, except to pay at lowest market price for bonds in which the same shall be invested, until the time and conditions mentioned below shall occur, and then only as hereinafter provided.

"6. When the head camp equalization fund, including the bonds in which the same shall be invested at the market value thereof, shall equal four million dollars, but not before, with the single exception mentioned below, the subsequent interest and other accretions to said fund shall, at such times as the board of head managers deem expedient, be transferred to the benefit fund, to diminish the number of benefit assessments. The exception above referred to is the following: If in any calendar year more than fifteen assessments are required without aid from the equalization fund, then the board of head managers shall in December of such year use

the interest accrued during such year on the equalization fund, or some part thereof, to aid the benefit fund. In such case said board shall have power to authorize the issuance of warrants on the equalization fund to effect said aid.''

Said section 101a now appears as section 100 in the revised constitution. It was in some particulars amended with reference to investment of securities at the head camp session held at Salt Lake City, Utah, in August, 1900, but not in any particular that required increased payments from the benefit members.

Section 104 of the constitution adopted at Helena, Montana, in August, 1896, was subsequently amended under the system prevailing under defendant's rules and constitution at the head camp session held in San Francisco, California, in 1898, and also on the initiation of the executive council by a two-thirds vote, ratified by a two-thirds vote of all the camps in the jurisdiction of defendant, in August, 1899, and is now incorporated as section 103 of the revised constitution, which section was not amended subsequent to August, 1899, and as so amended contains the following provisions as to each benefit member: ''To remain in good standing he must pay to the clerk of his camp, during the month immediately prior to the one for which it is called, every benefit assessment, whether single or multiple; must pay camp dues and equalization fund payments on the month when the same are payable. * * *

''Each benefit member must pay at least one benefit assessment in advance in each calendar month, unless, in fact, notice is given that no assessment is to be paid for any special month. Any member who fails to pay his camp dues or benefit assessment, all equalization fund dues during the month in which the same severally are payable, shall stand

suspended, and until and unless reinstated, neither he nor his beneficiaries shall be entitled to any of the rights and privileges of a member of the order.''

John T. Woods, husband of plaintiff, departed this life on the 18th of December, 1900, as the result of being run over by a railway car or train while engaged in the vocation of a railway freight brakeman, in which vocation he had been engaged, without knowledge at or during the time of either plaintiff or defendant, since the first day of August, 1900, and continuing up and until the time of his death. For some time prior to his death and prior to his entering said vocation said John T. Woods was not living with his family, and his whereabouts and vocation were unknown to his wife, plaintiff below, but during all said time plaintiff in his behalf regularly paid to the clerk of his camp the sums required for the camp dues, assessments and equalization fund according to the amount of protection which he carried, but made no payment on account of his being engaged in said extra hazardous vocation. At divers times prior to August, 1900, said John T. Woods had been engaged in hazardous vocations, and on such occasions had paid the extra hazardous rate, to the amount in the aggregate sum of $23.10, which was no more than the constitution and laws of defendant as heretofore set forth and claimed by the defendant to be in force at the time when said payments were made required in that behalf. Including the regular assessment paid to his camp clerk in the month of December, 1900, for transmission to the head camp in January, 1901, 127 assessments, numbered from 0 to 126, inclusive, were and had been due from said John T. Woods, all of which, amounting to $165.10, had been paid in due time, the last payment of such assessment having been made by plaintiff on behalf of said John T. Woods, on the 8th day of

December, 1900, to apply on what is known as January, 1901, assessment, not delinquent until close of December, 1900, to keep said Woods in good standing until the last day of January, 1901. In addition to said payments, the head camp had received in due time as the result of payment of camp dues regularly made, and otherwise, all the *per capita* tax due to its general fund, amounting in the aggregate to $18.75. Defendant had also received as the result of payments made prior to the death of said John T. Woods, for and on his account, for its equalization fund, paid at proper times, the amount of $3.90, being all the payments due on account of said equalization fund required by the constitution and rules of defendant.

No contention is made by defendant that if John T. Woods had died as the result of ordinary disease or the ordinary hazards of non-hazardous vocations plaintiff on account of said payments would be entitled to receive the sum of $3,000.

At the time of the death of said John T. Woods, the equalization fund of defendant amounted approximately to the sum of $190,000 and the collections in the benefit fund of defendant at said time in the hands of the head banker and of its different camp bankers amounted approximately to $130,000 after paying all death claims then approved by defendant, and the total number of benefit members of defendant at that time was approximately 58,000.

The second condition upon the back of the certificate of insurance reads as follows: "In case of his death while a member of this fraternity in good standing, his beneficiary shall receive such sum as may be collected from an assessment upon all members according to the certificates held by each, but said sum to be paid shall not exceed the amount stated on the face of this certificate."

The latter part of section E, division I of the constitution of the defendant company, of 1890, reads as follows: ''The rates of assessment for benefits at death shall be as follows, on an amount not to exceed the sum mentioned; but the benefit to be paid shall in no instance exceed the sum realized from one assessment on each member in good standing in the order at the date a death occurs.''

Section 1 of article 6 of the constitution of the defendant company of 1892-94 reads as follows: ''It shall have supervision over all the camps within its jurisdiction; shall prescribe laws for their government; shall provide rituals and supplies for their use; and shall have power to collect and assess from every member, through the camps, as often as may be required, such amount as each member shall agree to pay when joining this fraternity; to pay benefits upon the death of members in good standing; and to levy and collect such tax upon the camps as may be necessary to pay the expenses of the head camp.''

That as to this statement of facts it is understood there is no admission on the part of plaintiff that any head camp session or legislative meeting of defendant held outside of the state of Colorado, or the action of the executive council of defendant in attempting to change the rules, or constitution, or by-laws of defendant, are of any force or legal, though claimed by defendant to be of full force and legal when adopted as above. The question of law is to be determined by the court upon the facts as shown.

The foregoing constitute all the facts having any bearing upon the questions that we deem it necessary to determine on this review.

The court rendered judgment in favor of appellee, plaintiff below, for the amount named in

the certificate, with interest.  The appellant, defend-
ant below, brings the case here on appeal.

Mr. H. N. HAYNES and Mr. CHAS. M. CAMPBELL,
for appellant.

Mr. DEXTER T. SAPP and Mr. SPRIGG SHACKEL-
FORD, for appellee.

Mr. JUSTICE GODDARD delivered the opinion of
the court.

The questions presented for our determination
by this record are whether the trial court erred in
its conclusion that the appellee was entitled to have
the amounts paid on account of what is termed the
equalization fund, her portion of the alleged excess
in the benefit fund and the amount paid on the 8th
of December, 1900, applied in payment of the addi-
tional assessments incurred by reason of her husband
engaging in the business of railway freight brake-
man.

It is contended by appellee that these three items
were collected by appellant without authority, and
that appellee is entitled to have the same applied
as above stated.  This contention is based upon the
ground that the sections of the constitution provid-
ing for the creation of an equalization fund and for
the payment of the benefit assessment monthly in
advance, in each month, instead as theretofore, after
claims for death losses had been presented and ap-
proved are void:  First, because these changes of the
fundamental law and by-laws were made at meetings
of the head camp held outside the state of Colo-
rado; second, because such amendments impair the
obligation of the original contract with the assured,
and are not within the power of amendment reserved
to the order.

1.  Upon the first proposition we think the court

correctly held that the provisions complained of were not invalid because adopted at sessions of the head camp held outside of the state of Colorado.—*Sovereign Camp W. O. W. v. Fraley*, 51 L. R. A. 898; *Derry Council v. State Council*, 197 Pa. St. 413.

2. We are also of the opinion that the second proposition cannot be maintained. The certificate issued to Woods provides that while in good standing he is entitled to participate in its benefit fund to be paid at his death to the appellee, "subject to all the conditions named in this certificate and named in its fundamental laws, and liable to forfeiture if said neighbor shall not comply with said conditions, laws, and such by-laws and rules as are, or may be adopted by the head camp or the local camp of which he is a member."

At the time this certificate was delivered to Woods it was provided in the fundamental laws then in force that a member who, after receiving a beneficiary certificate, should engage in certain prohibited vocations, including that of railway freight brakeman, should forfeit all insurance and benefits thereunder.

By subsequent legislation, the assured was given the privilege of engaging in the business of railway freight brakeman and of continuing his insurance by paying a prescribed amount in addition to the regular beneficiary rate specified in his certificate, but that a failure to pay said extra rate when so employed should deprive his beneficiary of any right to receive benefits as a result of his death from accident resulting from such hazardous occupation.

It is provided in the fifth subdivision of the articles of incorporation that the association shall have power to adopt a constitution, by-laws, rules and regulations for the government of the association, and may alter, modify or change such at will.

Section 1, article 26 of the constitution adopted at the first session of the head camp after its incorporation provides that this "constitution may be amended by a two-thirds vote of the head camp or by a two-thirds vote of the executive council when ratified by two-thirds of the camps in this jurisdiction." In view of this power of the order to amend its fundamental laws and by-laws, the provision in the certificate that the right to participate in benefits was subject to and should be forfeited by a failure to comply with the conditions named in the then "existing laws and such as may be adopted" by the order clearly recognizes the right of the order to amend its fundamental laws and by-laws in the particulars complained of.—*Fullenwider v. Royal League,* 73 Ill. App. 321, 336; *Fullenwider v. Royal League,* 180 Ill. 621; *Supreme Lodge v. Knight,* 117 Ind. 489; *Stohr v. San Francisco M. F. Soc.,* 82 Cal. 557; *Supreme Commandery v. Ainsworth,* 71 Ala. 436; *Supreme Lodge v. La Malta,* 95 Tenn. 157, *Hughes v. Wis. Odd Fellows' Mut. Life Ins. Co.,* 73 N. W. 1015.

In the case of *Fullenwider v. Royal League,* 180 Ill. 621, an amendment of the by-laws increasing the assessment in force when the contract was entered into was upheld. It is there said: "It is apparent that the new by-law was adopted in the manner provided for in the laws of the society and was not an unreasonable enactment. It was enacted under a right to amend the by-laws reserved expressly in the contract, and hence it cannot be claimed it in any manner impaired any vested right. The contract requiring compliance with any by-laws that might be thereafter enacted, and the certificate being accepted with such a clause therein, there is no vested right of having the contract in the certificate remain unchanged, because the recognition of the

power to make new by-laws is necessarily a recognition of the right to repeal or amend those theretofore made.''

In *Hughes v. Wis. Odd Fellows etc. Co., supra,* the charter of a mutual life insurance company empowered its directors to amend its by-laws and by an amendment it was provided that in case a member committed suicide his policy should not be paid. It was held that a member whose policy was issued prior to such amendment, who stated in his application that he would conform to the by-laws ''now in force or which may hereafter be adopted'' was bound by such amendment. Pinney, J., who delivered the opinion of the court, said: ''We think that the insured might and did contract with the defendant company to be bound and affected, in reference to by-laws and regulations of future enactment, as fully and effectually as if such laws and regulations were existing at the time he became a member, and might consent that they should enter into and form parts of the contract, modifying or varying the rights of the parties.''

In the Fullenwider case, 73 Ill. App. 321, 336, the following language was used: ''It will not be denied that the parties had power to contract with reference to future by-laws, or change of by-laws, and if they did so contract there is no injustice in enforcing such future or changed by-laws against the parties. There is no limitation that such changes of by-laws shall not be made for the general good of the widows and orphans' fund if it increases the burden of some or all of its members.''

All the above cases, and others that might be cited, announce the same rule; and no case has been called to our attention that holds that, under a contract in terms recognizing the right of change in the laws of a mutual benefit society, it cannot, for the common good of all the members, enact legislation

applying to all alike, whereby the requirements of good standing may be made more onerous than they were when the benefit certificate was issued.

It is manifest that the provisions for the creation of an equalization fund, and for the payment of the benefit assessment monthly in advance, thereby enabling the order to more promptly pay the claims for death losses were reasonable and for the benefit of the assured, as well as for the benefit of the entire membership, and that the association was fully authorized to enact such provisions.

Ever since the order provided for the creation of an equalization fund, the appellee, without objection, paid all assessments for that purpose, amounting in the aggregate to $3.90, and has also paid the monthly benefit assessment, without protest, to the amount of $2.20. Because of this, as well as for the reasons above given, the appellee cannot now successfully claim that these amounts were illegally exacted, or improperly applied, and that she is entitled to have the same applied in payment of the amount necessary to cover the extra hazardous risk.

Nor do we agree with the trial court that the retention of the $1.30 paid on the 8th of December estopped the association from disputing its liability on the certificate under the circumstances. This amount was the regular assessment due from Woods as a benefit member if he had not been engaged in a hazardous vocation. The association was under no obligation, nor did it have the right, to apply it to any other purpose than that for which it was paid. It is unnecessary for us to consider the other questions presented and argued, since in our opinion the judgment must be reversed for the reasons given.

*Reversed.*

CHIEF JUSTICE GABBERT and Mr. JUSTICE BAILEY concur.