Oliver Cabana, Jr., Plaintiff, *v.* Holstein-Friesian Association of America et al., Defendants.

(Supreme Court, Erie Special Term for Trials, June, 1920.)

Injunctions — when cancellation of certificates of advanced registry of cattle should be restrained — affidavits — evidence — fraud — Membership Corporations Law.

A person whose property rights are involved should be confronted by the witnesses against him and have an opportunity to cross-examine them. (P. 280.)

After official tests for determining the amount of milk and butter fat produced by certain cows belonging to a herd of pure bred Holstein-Friesian cattle, of which plaintiff was the owner, a number of these cows were accepted for advanced registry by the defendant Holstein-Friesian Association of America, a domestic membership corporation. Certificates in respect thereto were issued as provided by the rules of the association, and the name of each particular animal accepted was included in the official herd book, thus giving to such animal a substantially enhanced value. In an action to restrain the cancellation of said certificates because of the alleged fraudulent practice of a former herdsman of plaintiff in making the tests, the herdsman made an affidavit that his former statements made to defendant's executive committee in reference to cows tested by him at plaintiff's farm for advanced registry, were untrue. *Held,* that the cancellation of the certificates should be restrained until after plaintiff had notice of and an opportunity to be heard upon the charge of fraudulent tests.

Where during the investigation by defendant's executive committee as to whether said certificates had been obtained by fraud in the making of the tests, various statements were made by defendant's president and by members of the executive committee as to the advisability of cancelling some or all of the certificates based on tests in which said herdsman had a part, fair play requires that no director who is a member of the executive committee, to whom the plaintiff objects, shall vote, nor should the president against the objection of plaintiff preside or have the right to a deciding vote in case of a tie.

ACTION for injunction.

Daniel J. Kenefick, Henry W. Killeen, James O. Moore, John A. Kelley and Devoe P. Hodson, for plaintiff.

Nathan L. Miller, O. U. Kellogg, L. L. Babcock and C. M. Horn, for the defendant association and individual defendants.

W. A. Matteson and D. R. Cobb, for the defendants Brockway et al.

SEARS, J. The defendant Holstein-Friesian Association of America was incorporated in 1913 under article II of the Membership Corporations Law of the state of New York. The purposes of the association include the promoting and securing of the best interests of the importers, breeders and owners of the breed of Holstein-Friesian cattle, including the ascertaining, preserving and disseminating of useful information and facts as to their pedigrees and desirable qualities, and the distinguishing characteristics of the best specimens, and the preparing, publishing and supplying of all necessary volumes of the Holstein-Friesian Herd Book. This herd book as provided in the by-laws of the association includes a registry of all animals accepted for registry in it, and only such animals are eligible to registry as under the rules and regulations of the corporation are determined to be pure bred " Holstein-Friesian," a term which is further defined in the by-laws. In addition to the registry in the herd book of pure bred Holstein-Friesian cattle the association authorized a system of advanced registry under a by-law reading as follows: "A system of additional registration of animals already

registered in the Herd-Book of this corporation, based upon performance in the production of milk and butterfat, with minimum requirements for eligibility, and to be known as Advanced Registry, shall be maintained by this corporation under rules and regulations prescribed by its Board of Directors.''

Pursuant to this by-law the directors have established an elaborate system of rules for advanced registry. These advanced registry rules among other things provide the minimum requirements in the production of butterfat of various classes in order to entitle a cow or heifer to admission to advanced registry, and the manner and method of conducting official tests for determining the amount of milk and butterfat produced by a cow on official tests.

The advanced registry rules also include provisions for the registry of bulls based upon the admission to advanced registry of four or more daughters of any such bull.

The supervision and keeping of this system of advanced registry is one of the important functions performed by the defendant association. All tests are under supervision of inspectors selected by agricultural colleges, and in the state of New York by the College of Agriculture of Cornell University, and under the direction of an officer of the association known as the superintendent of advanced registry, who is a party defendant in this action.

Upon the acceptance of tests for advanced registry a certificate to that effect is issued to the owner of the animal, and the name of the animal with the record of the accepted test published in the advanced registry included in the official herd book. The issuance of such a certificate in respect to any animal gives to such animal a substantially enhanced value.

Admission of animals to registry in the herd book

and to advanced registry is not confined to animals belonging to members of the defendant association, but is granted generally to the owners of animals which meet the required tests.

The advanced registry rules of the association contain the following provisions: Following a clause in respect to food and drink under the sixth subdivision of special rules for the conduct of official tests under rule VI: ''And if it shall be ascertained at any time that the spirit and intent of this rule has been violated or evaded, then and in that case any record made or influenced by any means in violation of this rule may be rejected; and if it has been accepted, it may then be expunged and canceled of record and rejected; and any person violating this rule may be expelled and excluded from and denied all privileges or rights or recognition in or by this Association.'' Section 11 of special rules for the conduct of official tests under rule VI: '' But no tests of cows shall be accepted for the Advanced Register by the Superintendent unless he shall be satisfied that such tests have been in all things fairly and honestly conducted and that the rules of the Association have been complied with. If the Superintendent shall be satisfied that any dishonest or improper practice in connection with the making of any test has been employed, or a reasonable suspicion thereof exists, he may reject such test, or, if the same has been previously accepted and a certificate issued he or the Board of Directors' may cancel such acceptance and certificate, and in all such matters his decision shall be final.'' Rule IX, entitled '' Expunging of Incorrect Entries,'' reads: '' Upon evidence of such incorrectness, any incorrect entry may be expunged from the manuscript or printed volumes of this registry by the Board of Directors, and the Certificate of Registry be

revoked; and in such case, the Board of Directors shall cause to be published in the next following volume of this registry the revocation of such record and certificate thereof.''

The plaintiff since 1912 has been an owner and breeder of Holstein-Friesian cattle, having a stock farm at Elma, Erie county, N. Y., where he has gathered together a large herd of pure bred Holstein-Friesian cattle. In many instances he has applied for advanced registry for members of his herd, and after official tests many of these animals have been accepted for advanced registry, and certificates in respect thereto issued as provided in the rules of the association. Some sales have also been made by him of such advanced registered cattle after the obtaining of the certificates. In fact, he himself and his assigns are the holders of a large number of such advanced registry certificates.

About June 1, 1915, there came to work as herdsman for the plaintiff at his Elma farm one Charles E. Cole, who remained in the employ of the plaintiff until December 19, 1918. As herdsman he milked the cows during many of the tests and had charge of a number of the cows tested for advanced registry at the Elma farm, upon which tests many certificates now held by the plaintiff and by his assigns were issued. After leaving plaintiff's employ Cole removed to the state of Vermont, where he engaged in business on his own account. In 1919 Cole fell under suspicion of the dairy department of the Vermont agricultural institution, which at that time supervised the making of the tests for advanced registry on behalf of the defendant association, it being then claimed that Cole, while conducting an official test upon a certain cow, engaged in the fraudulent practice of injecting cream and warm water into the milk of said cow in the milking pail,

thereby fraudulently increasing the quantity of milk and the percentage of butterfat contained therein.

This matter being reported to the board of directors of the defendant association, such board referred the matter to its executive committee, consisting of five of its directors, with instructions to make a full investigation. The committee met at Chicago on the 5th day of August, 1919, and Cole appeared before the committee and made a statement in writing admitting the commission of the fraud in the test of the cow above mentioned, and asserting that while in the plaintiff's employ he had practiced a similar method in the tests of a number of the plaintiff's cows at the Elma farm. The executive committee then adjourned its meeting to Cleveland, and requested the plaintiff by telegraph to appear before the committee. The telegram, however, did not state definitely the purpose of the adjourned meeting, although the subject matter of the investigation was then generally known. The plaintiff appeared before the committee and was informed by its chairman that the committee had met for the purpose of inquiring into and ascertaining the accuracy of various records that had been made, and informed the plaintiff of the statement of Cole and of another former employee of the plaintiff at the Elma farm in respect to the tests of sundry cows of the plaintiff which had been accepted for advanced registry. The plaintiff on that occasion was accompanied by counsel and was informed that he was at liberty to bring his counsel before the committee if he desired to do so, but plaintiff stated that he did not feel the need of counsel, and expressed himself as being desirous of aiding the committee in their investigation and arriving at the truth as to the statements of Cole. He was asked if he would like to have Cole come in and to question him himself, and he replied that he would not.

The meeting of the executive committee was further adjourned to a subsequent date at Buffalo, N. Y., and was convened there on the 25th of August, 1919, at which time plaintiff appeared before the committee with his counsel and presented an affidavit of Cole retracting previous statements made by him before the executive committee, setting forth in substance that all the statements made by him before the executive committee in reference to the cows tested by him at the Elma farm were untrue, and the plaintiff also presented to the executive committee the affidavits of other persons, and his counsel presented and read a statement signed by the plaintiff, setting forth among other things, " We demand a public hearing upon the question of the truth of Cole's alleged confession, at which all parties interested may appear and produce evidence and cross examine witnesses."

From the Buffalo meeting the committee adjourned to meet at Chicago on the 22d of September, 1919, and the president of the association directed the secretary, in accordance with the by-laws, to call a meeting of the full board of directors of the association for the same day at the same place, and to give notice to the plaintiff and to all other persons who were interested that they would be given a hearing before the full board of directors and be at liberty to produce witnesses and present any testimony or arguments that they desired to present to the board of directors.

Before the date appointed for the meeting of the board of directors in Chicago this action was instituted by the plaintiff in which he seeks to restrain the defendant association and the individual defendants, who are the persons acting as directors of such association, and the superintendent of advanced registry, from canceling or expunging the records of the plain-

tiff's cattle made at the Elma farm, and pending the litigation a temporary injunction has been in effect.

Various statements were made by the president and members of the executive committee during the time that the executive committee had this investigation in charge in respect to the advisability of canceling some or all of the certificates of advanced registry based upon tests in which Cole had a part.

There is another branch of this case. The certificate of incorporation filed in 1913 fixed the number of directors at six, but at all the meetings held thereafter down to the meeting held in June, 1919, directors were elected so as to make the full board consist of nine. Article III of the constitution of the corporation adopted by the members at a meeting held in 1913 provided: " The annual meeting of said Corporation shall be held on the first Wednesday of June in each year at such place within the United States as shall be determined upon by the corporation in the manner described in its by-laws. Said annual meeting may be held outside of the State of New York."

In the year 1915 the annual meeting was held at Syracuse, N. Y. In 1916 at Detroit, Mich. In 1917 at Worcester, Mass. In 1918 at Milwaukee, Wis. In 1919 at Philadelphia, Penn.

At the annual meeting in 1919 the by-laws were further amended to increase the number of directors to sixteen, and at this meeting there were elected ten directors, three to fill the vacancies arising in the case of three by the expiration of their three-year term of office, and as to seven by the amended by-law. The certificate of increase required by section 14 of the Membership Corporations Law was signed by eleven persons, eight of whom were new members of the board elected at the Philadelphia meeting, and three of whom were directors previously elected who held over. The

certificate was filed in the proper offices the following month.

It also appears that one of the directors who signed this certificate, and who was elected at the Philadelphia meeting, Frank L. Morris, was not a member of the association as an individual, although he was interested in a corporation to which membership had been granted in the corporation name in accordance with the by-laws.

Upon these facts the plaintiff contends (1) That neither the association nor its board of directors in any case has power to cancel the certificates, but that in a proper case resort must be had by the association to an action in the courts.

(2) That the election of all the directors is invalid because all were elected at meetings of the association held without the state of New York.

(3) That the directors elected at the Philadelphia meeting were not legally elected for the reason that the certificate of increase had not been filed in the proper offices before the election took place, and consequently the election of all who were chosen at the Philadelphia meeting was void, it being impossible to distinguish who were elected to fill the vacancies caused by the expiration of the term of their predecessors and who were elected to fill the newly created positions.

(4) That the election of the director Morris was invalid because he was not an individual member of the association.

(5) That the directors are not entitled to cancel the certificates under the rules for advanced registry above quoted, because none of the rules assures to the plaintiff the " law of the land."

Three of the defendants who were chosen directors at a meeting of the association held previous to the

Philadelphia meeting have filed an answer stating the facts in relation to the Philadelphia meeting, and asking for such judgment as may be just, proper and legal, to the end that the association may be properly controlled and managed by lawfully chosen directors, officers and committees, and that the rights of the membership may be best protected and promoted.

It is convenient to consider first the questions relating to the personnel of the directorate. From the time of the first meeting after the incorporation of the association to the meeting in June, 1919, the affairs of the corporation were concededly conducted by nine persons elected at annual meetings, the first of which was held within the state of New York, and afterward all others outside of the state; and after the Philadelphia meeting by fifteen individuals, of whom all but one have taken part in the meetings of the directors, and of whom ten were elected at the Philadelphia meeting.

If it is necessary that the directorate should be constituted in all respects in accordance with law, the plaintiff must be granted relief against some of the defendants in this case at least, for no proceeding to increase the number of directors beyond six is in all respects regular.

There was no proceeding under section 14 of the Membership Corporations Law to increase the number of directors from six to nine between the time of the filing of the certificate and the Philadelphia meeting of 1919. During that period the fundamental law of the association limited the directorate to six. Likewise the increase of the board at the Philadelphia meeting did not become legally effective until the filing of the certificate in the proper offices required by section 14 of the Membership Corporations Law. *Lewis* v. *Matthews,* 161 App. Div. 107; *Matter of Westchester Trust*

Supreme Court, June, 1920.          [Vol. 112.

*Co.,* 186 N. Y. 215; *Matter of Dolgeville Electric Light & Power Co.,* 160 id. 500.

Even the certificate of increase filed after the Philadelphia meeting is insufficient, for the reason that it is not signed by a majority of the directors, but bears the signature as stated above of eight elected at the Philadelphia meeting, and of only three of the preceding directors, which latter three are themselves but *de facto* directors, being members of a board of nine of a corporation which was only entitled to six.

There is also a serious question as to the right of this corporation to hold its meetings outside of the state of New York. In the report of *Ormsby* v. *Vermont Copper Mining Co.,* 56 N. Y. 623, it is stated to have been held that according to the settled law of corporations, neither stockholders nor directors can do a corporate act outside of the jurisdiction creating the corporation, which shall be of force to bind those who do not participate in it. In *Derry Council* v. *State Council United American Mechanics,* 197 Penn. 413; *Sovereign Camp of Woodmen of the World* v. *Fraley,* 94 Tex. 200; *Woodmen of the World* v. *Woods,* 34 Colo. 1; and *People ex rel. Hoyne* v. *Grant,* 283 Ill. 391, a distinction is drawn in this respect between corporations for profit and social or membership corporations.

These interesting questions are not, however, before the court in the instant case. In order that they might be raised the action would have to be one to test the right of the individual defendants other than Graham to hold their offices. In other words, the attack would have to be direct, while here it is collateral.

In *Wallace* v. *Walsh,* 125 N. Y. 26, the stockholders of the Syracuse Stove Company reduced the number of its trustees from twelve to nine, but the certificate

of reduction was never filed, as required by law. Its annual corporation reports were signed by only six of its trustees, whereas the law provided that unless such reports were signed by a majority, its trustees would be jointly and severally liable for all of its debts. The company itself was insolvent, and the plaintiff was claiming that the action reducing the number of the trustees from twelve to nine was invalid because the certificate had not been filed, and that, therefore, the reports were not signed by a majority of the trustees, and hence they themselves were personally liable for the company's debts under the statute. The court, however, held that the plaintiff could not thus collaterally attack the validity of the action reducing the number of trustees, but that this question could be raised only in a direct action, saying: "Neither the company nor its trustees or stockholders could have been heard to allege in a collateral proceeding, the invalidity of their action in reducing such board, or its want of authority to administer the general affairs of the corporation. Whatever might have been the effect upon the corporation of a direct proceeding by the attorney-general, or otherwise, to test the legality of their action in reducing such number, or by doing business with an insufficient or defective board, we think such action could not, collaterally, be assailed and tried in a proceeding wherein the question was only incidentally involved." *People* v. *Hills,* 1 Lans. 202; *Trustees of Vernon Society* v. *Hall,* 6 Cow. 23; *All Saints Church* v. *Lovett,* 1 Hills, 191; *Hudson River R. R. Co.* v. *Kay,* 14 Abb. Pr. (N. S.) 191; *Lewis* v. *Matthews,* 161 App. Div. 107; *Humphreys* v. *Mooney,* 5 Colo. 282; *Wright* v. *Lee,* 2 S. D. 596; *Washington Lighting Co.* v. *Dimmick,* 41 App. Div. 596; *Moir* v. *Providence Savings Life Assurance Society,* 127 id.

**18**

591; *People* v. *Albany & Susquehanna R. R. Co.*, 57 N. Y. 161.

*Matter of Dolgeville Electric Light & Power Co.*, 160 N. Y. 500, is not in conflict with the cases just cited. The question there involved was whether a petition for voluntary dissolution of a corporation had been signed by a majority of the directors. The corporation originally had thirteen directors. At a meeting the number by resolution was reduced to five, but no transcript of the proceedings of the meeting was filed as required by law. The petition for dissolution was signed by a majority of the directors if the corporation had but five directors, while it was not signed by a majority if the corporation then had thirteen. The court held that the reduction in the number of directors did not take place until the transcript of the proceedings of the meeting was filed in the proper offices, that the corporation continued lawfully to have thirteen directors, that the statute in relation to a voluntary dissolution required a strict compliance with the law, and that there had been a failure to meet its terms. This was not a collateral attack, but a claim by the corporation of a right based upon a state of facts which showed a failure to comply with the terms of the statute. It had nothing to do with the carrying on of business by the directors, but was the claim of a privilege by the corporation itself under a statute which the court held had not been complied with.

The case at bar presents a clear instance of a collateral attack. Nor does the answer of the three directors change the situation. If the plaintiff cannot attack the election of the directors, the answering defendants have no greater right to do so.

We come, therefore, to the question as to whether the directors in any case have power to cancel the certificates, or whether the association must be

remitted, if cancellation is sought, to a direct action in a court of law for that purpose. The by-laws above quoted give a comprehensive scheme for the correction of errors. Subdivision 6 relates to a violation of the rules in reference to feeding. Rule IX relates to clerical errors, and subdivision 11, above quoted, covers cases where dishonesty occurs or improper practices are pursued. The defendant association's contention that the directors might cancel the certificates under the provisions of rule IX cannot be sustained. The word " such " before the word " incorrectness " in the phrase " upon evidence of such incorrectness " refers to something preceding. It cannot relate to the title, which is " The Expunging of Incorrect Entries," because in that case the word " such " would be meaningless. It must apply to some kind of incorrectness, as distinguished from any incorrectness; and this reference is made clear when the preceding rule is read which refers to a particular kind of incorrectness, viz., an incorrectness through clerical error.

But the directors are authorized to proceed under the provision of subdivision 11. The defendant association conceded upon the trial that it did not intend to act under that portion of subdivision 11 which provides for action by the superintendent of advanced registry, nor to cancel the certificate upon the basis merely of a reasonable suspicion of dishonesty or improper practice existing. It seems probable that such a rule would be unreasonable, and as the action sought to be taken by the association in this case relates merely to the right of the board of directors to act, any other proceeding under subdivision 11 will be enjoined. The sentence clearly means that if the board of directors shall be satisfied that any dishonest or improper practice in connection with the making

of any test has been employed, or a reasonable sus-
picion thereof exists, it may cancel such acceptance
and certificate; the introduction of the words " or the
Board of Directors " in the final part of the sentence,
must be construed to make their action dependent
upon their finding dishonesty or improper practice;
just as the superintendent would be authorized to act
if he were the judge of the case.  To be sure, no pro-
cedure for action by the board of directors is set forth
in the rules, but that is not necessary in such case.
The law requires certain procedure, viz., that there
shall be notice to the person whose property right is
to be affected, and an opportunity to be heard.  That
is, in a general way, the " law of the land." *Ostrom*
v. *Greene,* 161 N. Y. 353; *Williamson* v. *Randolph,* 48
Misc. Rep. 96; *Loubat* v. *LeRoy,* 40 Hun, 546; *Fritz* v.
*Muck,* 62 How. Pr. 69; *People ex rel. Holmstrom* v.
*I. D. B. B. Union,* 164 App. Div. 267.

It is not easy to define in advance exactly what the
limits are of what will be considered the " law of the
land."  That the plaintiff must have notice of the
hearing is indisputable, and the notice must advise
him of the subject which will be taken up, and the
result which may be anticipated if the proofs come
within the specification of the rule.  Thus in *William-
son* v. *Randolph, supra,* which involved a charge
against a member of the Consolidated Stock and
Petroleum Exchange of New York, which charge
would result in expulsion if established, Mr. Justice
Clarke in his opinion said: " The notice required by
fair play is a notice of the charges preferred.  There
is no provision in the constitution and by-laws for
service of a notice of the charge.  Such notice, how-
ever, is required in fairness to the accused, even in
the absence of any provision therefor in the by-laws."
*Fritz* v. *Muck,* 62 How. Pr. 69.  "A mere summons to
appear is not sufficient, but the accused should also

be given notice of the charges preferred." *People ex rel. Deverell* v. *Mutual Musical Protective Union,* 118 N. Y. 101; *People ex rel. Mercheim* v. *Musical Union,* 47 Hun, 273.

In *People ex rel. Johnson* v. *New York Produce Exchange,* 149 N. Y. 401, Chief Judge Andrews writing said: " To require technical precision in complaints of this character, drawn by merchants or business men, and to apply to them the strict rule of pleading in an action in a court of law would greatly embarrass, and many times defeat the disciplinary regulations of such associations. Members are entitled to fair dealing and to have their substantial rights protected. But the proceedings in such cases are necessarily somewhat summary, and mere informality, when substantial rights are preserved, ought not to render them void."

The tribunal before which the hearing is to be had in this case, as provided in the rules for advanced registry and the by-laws, is the board of directors with the president presiding. It must be a fair and unprejudiced tribunal. The question whether one who has been on an investigating committee, and has expressed an opinion, is disqualified from acting as a judge, because of what is similar to actual bias, in such a case as is here involved, is an open one in this state. *Wilcox* v. *Supreme Council of the Royal Arcanum,* 210 N. Y. 370.

But in this case, in view of the statements made in the course of the preliminary investigation by members of the executive committee and the president, fair play, which is the test in this kind of an examination, requires that no director, who is a member of the executive committee, to whom the plaintiff objects, shall vote upon the question of the cancellation of any of the certificates here involved; nor for the same

reason should the president, if the plaintiff objects to him, preside or have the right to a deciding vote in case of a tie.

At the hearing the proofs upon which the directors are to form their opinion must be presented in the presence of the plaintiff, and he must have an opportunity to explain and offer testimony on his own behalf. Fair play requires that he be allowed to cross-examine all witnesses produced. There are cases where such a hearing as is here in question has been set aside as unfair, because a person whose rights were involved was not allowed to cross-examine witnesses. *Hutchinson* v. *Lawrence,* 67 How. Pr. 38.

The implication in *Williamson* v. *Randolph,* 48 Misc. Rep. 96, and in *Matter of Haebler* v. *New York Produce Exchange,* 149 N. Y. 414, is to the effect that the plaintiff should have an opportunity to cross-examine witnesses.

*Rose* v. *Order of Patricians,* 126 Mich. 577, and *Dick* v. *International Congress,* 138 id. 372, are to the same effect.

The language of Sir George Jessel, Master of the Rolls, in *Labouchere* v. *Earl of Warncliffe,* 13 Ch. Div. 346, states the general principle: " The committee are not to form an opinion until ' after inquiry.' What does that mean? What kind of inquiry is intended? The words do not mean that they are simply to take up a newspaper, see in it that Mr. A. B. has written a letter, or has been brought up at a police-court for drunkenness, and then expel him. * * * What the rule which I have quoted means is, that there shall be a fair inquiry into the truth of the alleged facts. * * * What ought the committee of a club to do when the conduct of one of its members has been impugned? They ought to see what that conduct has been, and what excuse or reason can be given by the

member for it; and they ought to give notice to that member that his conduct is about to be inquired into, and afford him an opportunity of stating his case to them.

"In a case where a decision depended upon their opinion — in other words, upon their judgment — it was most important that the materials on which that judgment was formed should be accurately ascertained; and, of course, that could only be done by a proper investigation, by giving due notice to the accused, and by taking — I do not say legal evidence, or that evidence not directly legal might not be admissible — but by taking evidence on the question of fact before them, and satisfying themselves as to the truth. They could then form their opinion. \* \* \* If, having given the accused fair notice, and made due inquiry, the committee came to the conclusion that the conduct of one of the members of the club was injurious to its welfare and interests, no judicial tribunal could interfere with any consequences which might arise from an opinion thus fairly formed."

The association is not bound by the rules of common-law evidence. If such were the rule almost no decision of such a body as this could be sustained. 5 C. J. 1356; *Harris* v. *Aiken,* 76 Kans. 516; *Guinnane* v. *Sunnyside Boating Company of Toronto,* 21 Ont. App. 49.

In the case of the defendant association the directors have no power to subpœna witnesses. It may be impossible to obtain the presence of all the persons having knowledge of the circumstances. Under such circumstances, an explanation being offered, it would not be necessarily unfair to receive *ex parte* statements and other hearsay evidence. Whether such a proceeding would be fair or not can only be determined when all the facts are before the court, and not

in such an anticipatory action as this. As a general rule it cannot be doubted that a person whose property rights are involved should be confronted by the witnesses against him, and have an opportunity to cross-examine, and a departure from this rule must be the exception.

The defendant Gardner should, therefore, be enjoined from canceling the certificates.

The other individual defendant and the association should be enjoined from canceling certificates except after giving the plaintiff notice and an opportunity to be heard as above explained.

Judgment accordingly.